UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>Felix Antonio Abarca,<br><br>　　　　　　　　　　　　Defendant. | Case No.: 18-mj-02075-BGS-JLS-1<br><br>**ORDER DENYING MOTION TO DISMISS THE COMPLAINT FOR SELECTIVE PROSECUTION**<br><br>**[DOC NO. 12]** |

**I.　　STATEMENT OF THE CASE**

Felix Antonio Abarca ("Defendant") brought this Motion to Dismiss for Selective Prosecution ("Motion"). (Doc. No. 12-1.[1]) The Government opposed the Motion. (Doc. No. 24.) Defendant filed a reply to the opposition. (Doc. No. 27.)

Defendant was arrested on April 27, 2018 for illegally entering the United States. He was with another six people who were also arrested for illegal entry. Defendant and five others in the group claimed to be citizens of El Salvador. The one remaining individual claimed to be a citizen of Honduras. (Doc. No. 12-1 at 7; Doc. No. 24 at 5.) The

---

[1] Page citations reference the Court's CM/ECF pagination system. S

Government contends that Defendant was identified as a member of the caravan[2] and that he admitted he knew it was illegal to enter the United States without authorization. During the post-arrest interview, Defendant asserted an asylum claim. (Doc. No. 24 at 4.) Meanwhile nearly 200 asylum seekers from the caravan remained at or near the Port of Entry, with the first eight only permitted into the port late on April 30, 2018. (*Id.*) Of this group of seven, Defendant and two others were prosecuted for illegal entry while the remaining four individuals were not. (*Id.* at 5-6.)

On April 27, 2018 three hours after the group of seven was apprehended, a group of eighteen persons was apprehended for illegally entering the United States. Of these eighteen persons, three were citizens of India, one was from Mexico, and the remaining fourteen were from Central America (Honduras and Guatemala). (Doc. No. 12-1 at 7; Doc. 24 at 6.) Of this group, four of the people from Central America and one from Mexico were prosecuted for illegal entry; the remaining were not. (Doc. No. 24 at 6.)

Defendant claims the Government selected him for prosecution based on his national origin, alleging that of these groups of people arrested on April 27, 2018, "only those arrestees whom the Government believe[d] are citizens of Central American countries have been prosecuted." (Doc. No. 12-1 at 12.)

## II. THE LAW OF SELECTIVE PROSECUTION

In the case of *United States v. Armstrong,* 517 U.S. 456 (1996) the Supreme Court delineated the law governing a claim of selective prosecution:

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S. Ct. 1649, 1656, 84 L. Ed. 2d 714 (1985). The Attorney General and United States Attorneys retain "'broad discretion'" to enforce the Nation's criminal laws. *Wayte v. United States,* 470 U.S. 598, 607, 105 S. Ct. 1524, 1530–1531, 84 L. Ed. 2d 547 (1985) (quoting *United States v. Goodwin,* 457

---

[2] *See* Doc. No. 12-1 at 3-6 and Doc. No. 24 at 2-5 for the parties' descriptions of the caravan. In his reply, Defendant argues that "the government has provided zero evidence as to how or why it claims that [Defendant] was a member of the caravan but the alleged citizens of India were not." (Doc. No. 27 at 7.)

U.S. 368, 380, n.11, 102 S. Ct. 2485, 2492, n.11, 73 L. Ed. 2d 74 (1982)). They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; *see* 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S. Ct. 1, 6, 71 L. Ed. 131 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L. Ed. 2d 604 (1978).

Of course, a prosecutor's discretion is "subject to constitutional constraints." *United States v. Batchelder,* 442 U.S. 114, 125, 99 S. Ct. 2198, 2204–2205, 60 L. Ed. 2d 755 (1979). One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S. Ct. 693, 694–695, 98 L. Ed. 884 (1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles,* 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L. Ed. 2d 446 (1962). A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373, 6 S. Ct. 1064, 1073, 30 L. Ed. 220 (1886).

In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Chemical Foundation*, *supra*, at 14–15, 47 S. Ct., at 6. We explained in *Wayte* why courts are "properly hesitant to examine the decision whether to prosecute." 470 U.S., at 608, 105 S. Ct., at 1531. Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.*, at 607, 105 S. Ct., at 1530. It also stems from a concern not to unnecessarily impair the performance of a core

3

executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Ibid.*

The requirements for a selective-prosecution claim draw on "ordinary equal protection standards." *Id.*, at 608, 105 S. Ct., at 1531. The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Ibid.*; *accord*, Oyler, *supra*, at 456, 82 S. Ct., at 506. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted. This requirement has been established in our case law since *Ah Sin v. Wittman*, 198 U.S. 500, 25 S. Ct. 756, 49 L. Ed. 1142 (1905).

517 U.S. at 464-66.

### III. DISCUSSION

To dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Armstrong,* 517 U.S. at 463 (citations omitted). The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465 (citations omitted). The Court addresses each requirement in turn.

### A. Discriminatory Effect

The first prong of the prima facie showing for a selective prosecution claim, discriminatory effect, ensures that the government has at least conducted selective prosecutions; if similarly situated persons are being prosecuted then appellants fail to make the required showing. *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989). In *United States v. Arenas-Ortiz*, 339 F.3d 1066 (9th Cir. 2003), the Court held that to meet the first requirement of discriminatory effect, the defendant "must show that similarly situated individuals of a different [ethnic origin] were not prosecuted." *Id.* at 1068–69; *see also United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam). This standard for demonstrating a violation of equal protection is "a demanding one." *Armstrong,* 517 U.S.

at 463.

The purpose of identifying a "similarly situated class of lawbreakers" is so that the factor allegedly subject to impermissible discrimination is isolated. This similarly situated group "is the control group." In all relevant respects, the control group and the defendant are the same, save the factor allegedly subject to the impermissible discrimination. *See, e.g.*, *Aguilar*, 883 F.2d at 706 ("If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination."). Analogous to the present case, the *Arenas-Ortiz* defendant had to show that "non-Hispanic-males were not prosecuted even though they: (1) were aliens, (2) had been removed or deported from the United States, and (3) had re-entered without the consent of the Attorney General." 339 F.3d. at 1068 (citing 8 U.S.C. § 1326).

Further, the Ninth Circuit in *United States v. Bourgeois*, 964 F.2d 935 (9th Cir. 1992) held that the relevant inquiry for a control group is the history of prosecutions over a reasonable period of time. In *Bourgeois*, the defendant focused on firearms prosecutions which stemmed from arrests during a successive two-day phase of Operation Streetsweep; only black men from the Operation Streetsweep arrests were prosecuted in the Los Angeles area. Defendant argued that his prosecution was unconstitutionally based on his race. The district court found Defendant's proposed two-day focus too narrow. Instead it considered a two-year time span, August 1, 1988 to July 31, 1990, and found that the government had charged more than 140 people in the Central District of California with being a felon in possession of a firearm or with making a false statement in connection with the purchase of a firearm, and the defendant did not allege that all or most of these cases involved black individuals. The Ninth Circuit found that the district court properly focused its inquiry on prosecutions over a reasonable period of time. "Bourgeois [made] no attempt to show that, in any span of time, the government has declined to prosecute similarly situated, non-black felons illegally in possession of firearms." *Bourgeois*, 964 F.2d at 941. It further cited for support *United States v. Aguilar* which examined all federal prosecutions in Arizona for alien smuggling over a three-year period. *Id.* at 940 (citing 883 F.2d at 703).

In the present case, Defendant under *Armstrong* and *Arena-Ortiz*, acknowledges that he has the burden to demonstrate that "the government chose not to prosecute people who were *not* from Central American countries even though they (1) were aliens (2) who had attempted to enter the United States at a time and place other than as designated by immigration officials. *See* 8 USC § 1325." (Doc. No. 12-1 at 11-12.) However, he narrows this control group to only the two groups arrested on April 27, 2018. The thrust of his argument is that of these twenty-five arrestees, only those arrestees from Central American countries were prosecuted.[3] He claims that three people from India were not prosecuted, and they were similarly situated to Defendant. He argues this plainly demonstrates discriminatory effect.[4] (*Id.* at 12.)

---

[3] This is incorrect. A Mexican national was also prosecuted. (Doc. No. 24-1 at 1-3.)

[4] In Defendant's reply brief, he argues for a different class of individuals who were impermissibly targeted for prosecution that includes Mexican citizens in addition to Central Americans. Initially in his Motion, Defendant asserts he and other arrestees were prosecuted "precisely due to their alleged Central American origin." (Doc. No. 12-1 at 2.) However, in his reply, Defendant acknowledges that government selected only caravan members "alleged to be citizens of countries in Central America or *Mexico*" for prosecution. (Doc. No. 27 at 2 [emphasis added].) This statement alters Defendant's control group, or similarly situated class of law breakers, to require Defendant to demonstrate that the "government chose not to prosecute people who were *not* from Central American countries [or from Mexico] even though they (1) were aliens (2) who had attempted to enter the United States at a time and place other than as designated by immigration officials" (3) and were caravan members. (*See* Doc. No. 12-1 at 11-12.) Defendant does not offer any support for this new argument in his reply. He also fails to look at the history of prosecutions over a reasonable period of time. Further, even when limiting the control group to Defendant's impermissibly narrow scope (the two groups of illegal entrants arrested the night of April 27, 2018), his argument fails. Under Defendant's revised position, the three Indian nationals, as non-caravan members, would no longer be similarly situated to Defendant and thus would fall outside of the control group. As Mexican citizens are now included within Defendant's impermissibly targeted class of individuals, there would be no similarly situated non-Central American or Mexican individuals who were not prosecuted by the government. Thus, Defendant would have no "similarly situated" control group to point to in an attempt to establish discriminatory effect. *See Aguilar*, 883 F.2d at 706 ("Absent a similarly situated control group, the government's prosecution of a defendant exercising his constitutional rights proves nothing."). Additionally, even if Defendant's proposed control group is redefined to include all non-Central American caravan members who entered the United States illegally in the two identified groups on April 27, 2018, his argument would still fail. As Defendant acknowledges, a Mexican national identified as a caravan member was also prosecuted. As an illegal entrant and caravan member who is neither a minor nor traveling with a young minor, this Mexican individual is similarly situated to Defendant and an appropriate control group member. Thus, the Government prosecuted a similarly situated individual who was non-Central American, once again undercutting Defendant's ability to

The Government's Exhibit A shows that two groups affiliated with the caravan were arrested on April 27, 2018. (Doc. No. 24-1 at 1-3.) Of the group of seven individuals, three people were prosecuted and four were not. (*Id.* at 1.) Of the group of eighteen individuals, four people from Central America and one from Mexico were prosecuted. (*Id.* at 2.) The three people from India and the remaining people from Central America were not prosecuted. (*Id.*) Further, the Government presents statistics from January 1, 2017 to May 11, 2018 of the number of illegal entrants prosecuted along the San Diego and El Centro sectors. Of the 3,129 aliens prosecuted, 2,958 were from non-Central American countries, and 171 were from Central American countries. (Doc. No. 24 at 9; Doc. No. 24-2 at 4-5.)

The Court finds that Defendant has failed to establish a colorable basis for the first element, that similarly situated individuals who are not from Central America were not prosecuted for illegal entry. First, Defendant's control group is too narrow. Defendant is cherry-picking the arrests of two groups on April 27, 2018 and asking the Court to ignore any relevant inquiry into the history of prosecutions over a reasonable period of time. This approach has been soundly rejected by the Ninth Circuit. *See Bourgeois*, 964 F.2d at 940-41 ("As a policy matter, Bourgeois' narrow time focus is untenable. If adopted, it would severely limit law enforcement efforts directed at specific groups of criminals."). The relevant inquiry is the history of prosecutions over a reasonable period of time. Defendant makes no attempt to show that over a reasonable period of time the Government declined to prosecute similarly situated illegal aliens entering along our southern border (El Centro and San Diego sectors) who were not from Central America.

Second, and notwithstanding this fatal flaw in his Motion, the fact of the matter is that similarly situated illegal entrants who are not from Central America *have been*

---

establish discriminatory effect. *See id.* ("Appellants must demonstrate as a prerequisite to an evidentiary hearing that similarly situated persons are generally not prosecuted for the same conduct.").

1 *prosecuted*, both when looking discretely at April 27, 2018 as Defendant proposes and over
2 a more extended time period. The Government has shown that from January 1, 2017 to
3 May 11, 2018, ninety-five percent (95%) of prosecutions for illegal entrants were not from
4 Central America. *See e.g.*, *United States v. Aguilar*, 883 F.2d 662, 707-08 (9th Cir. 1989)
5 ("If all persons breaking the immigration laws were considered similarly situated, then
6 appellants' argument would fail."). Additionally, in contradiction to Defendant's
7 contention that of the group of twenty-five arrestees only Central Americans were
8 prosecuted, from that same group a citizen of Mexico was also prosecuted. (Doc. No. 24-
9 1 at 2.)

Finally, Defendant's Motion establishes that similarly situated people not from Central America were prosecuted for illegal entry during this same time frame. According to his Motion, attorneys from Federal Defenders reviewed all complaints filed during the week of April 30, 2018 and 8 U.S.C § 1325 complaints were only filed against persons from Central America and Mexico, but no other countries. (Doc. No. 12-1 at 9.) Supervisory attorney Norma Aguilar reviewed all complaints in every case filed in the Southern District of California for every defendant whose initial appearance took place on April 30, 2018 and May 1, 2018. She found that on those days, none of the complaints charging violations of 8 U.S.C § 1325 feature a defendant who was accused of being a citizen of India. (Doc. No. 12-2 at 58.) However, the declaration leaves out the number of persons from non-Central American countries, including Mexico, who were also prosecuted. Thus, the prosecution of Mexican nationals who were similarly situated to Defendant undercuts Defendant's discriminatory effect argument. *See Aguilar*, 883 F.2d at 706.

In sum, Defendant has failed to provide clear evidence of discriminatory effect to dispel the "presumption of regulatory" that the prosecution has not violated the equal protection clause by prosecuting Defendant for illegal entry. *See Armstrong*, 517 U.S. 464-66.

///

**B. Impermissible Motive**

The second element of a claim premised on selective prosecution is that the "prosecution be based on an impermissible motive." *Bourgeois*, 964 F.2d at 941; *Armstrong*, 517 U.S. at 465 (claimant must show the policy was "motivated by a discriminatory purpose"). "'[A]wareness of consequences' is not the same as intent to discriminate. The kind of intent to be proved is that the government undertook a particular course of action 'at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group.'" *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)).

In *Bourgeois*, the Ninth Circuit held that the defendant failed to establish a colorable basis for the second element of his claim, that "[his] prosecution is based on an impermissible motive." 964 F.2d at 938 (quoting *United States v. Wayte*, 710 F.2d 1385, 1387 (9th Cir. 1983)). The defendant alleged that the motivation behind the two-day sweep could not have been race-neutral and have achieved the result it did. However, the Ninth Circuit disagreed, finding that for the operation of timed, coordinated arrests, the government presented a "permissible motive": it credibly maintained that it targeted persons associated with the Crips and the Bloods because those gang members are often armed, violent and involved in drug trafficking.

Here, Defendant argues that the Government impermissibly targeted him for prosecution based on his Central American alienage. He argues the reason the Government chose to prosecute Defendant, and not the illegal entrants from India, is plain: "only targeted Central American migrants of the caravan were selected for prosecution." (Doc. No. 12-1 at 13-14.)

The Government in its opposition replies that its permissible motive to prosecute Defendant, and not the Indian nationals, was to deter members of the caravan from circumventing the lawful asylum process by sneaking into the country illegally. Defendant was identified as a member of the caravan, and therefore prosecuted. The three Indian nationals were not so identified. A prosecution of the Indian nationals offers no pointed

deterrence toward the hundreds of caravan members assembled near the port of entry. (Doc. No. 24 at 9-10.) According to the Declaration of United States Border Patrol Assistant Chief Patrol Agent Ryan Yamasaki, the prosecution of Defendant was to deter caravan participants from unlawfully entering the United States and then seeking asylum when apprehended, instead of waiting in line at the Port of Entry to present themselves for asylum requests. By illegally entering, Defendant was in effect cutting the line in front of the caravan participants who were waiting at the Port of Entry. (Doc. No. 24-2 ¶¶ 6-8.)

The Court finds that the Government presents a permissible motive to prosecute Defendant, *i.e.*, to deter caravan members from illegally entering the country, and then claiming asylum, effectively cutting the line of asylum seekers at the border.[5] There is ample evidence to support this permissible motive. First, if prosecution of Defendant was based on his Central American national origin as opposed to his being a member of the caravan seeking political asylum, then the Government would *not* have prosecuted the one Mexican national, who initially claimed to be in the caravan. Nor would the Government have released the Central American mother and her child who claimed they had left the caravan in Mexico City.[6] (*See* Doc. No. 24-1 at 1-2.) As declared by Agent Yamasaki, the three citizens of India as well as the mother and her minor daughter were not charged because they were not identified as caravan members. (Doc. No. 24-2 ¶¶ 11-12.) Such

---

[5] Additionally, Agent Yamasaki's duties include the "management and oversight of all criminal prosecutions." (Doc. No. 24-1 ¶ 1.) His sworn Declaration states that, "At no point did Border Patrol target citizens of Central American countries for prosecution because of their nationality." (*Id.* ¶ 13.) This is in keeping with the type of evidence the Ninth Circuit has relied on to dispel selective prosecution claims. *See, e.g.*, *Turner*, 104 F.3d at 1185 ("the prosecutors and FBI investigators have under oath denied" that their intent to prosecute black defendant gang members was based on their race).

[6] Further, as set forth in Agent Yamasaki's Declaration, "Border Patrol also took into account humanitarian considerations" and on a "case-by-case basis" elected to "forego seeking criminal prosecution against caravan members who entered illegally but presented health issues or special needs, including those traveling with young children." (Doc. No. 24-2 ¶ 8.) The Government's Exhibit A identifies eleven individuals of Central American origin who were identified as caravan participants but were not prosecuted. Nine of those eleven were minors. Of the two other Central American individuals who were not prosecuted, one was eight and a half months pregnant, and the other was traveling with a two-year-old minor. (Doc. No. 24-1 at 1-2.)

prosecutorial conduct refutes the notion that Defendant was prosecuted because he is of Central American origin and supports the motive that he was prosecuted because he was a caravan participant.

Further, between April 27, 2018 and April 29, 2018, 232 illegal entrants who were not identified as caravan members were apprehended but not prosecuted. Of this group, thirty-four were from Central American. (*Id.* ¶ 13; Doc. No. 24 at 9.) If the Government were selectively prosecuting illegal entrants from Central America, then consistent with this policy these thirty-four entrants would also have been prosecuted. The fact that they were not impeaches Defendant's claim of improper motive.[7]

Defendant in his moving papers states that "only targeted Central American migrants of the caravan were selected for prosecution." (Doc. No. 12-1 at 14.) Thus, even Defendant admits that membership in the caravan was a condition for being prosecuted. Further, in his Motion Defendant never contends he was not a member of the caravan. Instead, in his reply he merely takes issue with the fact that "the government has provided zero evidence as to how or why it claims [he] was a member of the caravan . . . ." (Doc. No. 27 at 7.) Pursuant to Local Criminal Rule 47.1.g.1, "when an opposing party contests a representation of fact contained in a moving declaration, opposition must likewise be

---

[7] Further, this fact undercuts Defendant's argument that the Government's failure to follow its own "zero-tolerance" policy evidences discriminatory intent. In his Motion, Defendant points to Attorney General Jeff Sessions' April 6, 2018 announcement of a "zero-tolerance" policy for criminal illegal entry directing the United States Attorney for the Southern District of California to "prosecute all Department of Homeland Security referrals of section 1325(a) violations, to the extent practicable." (Doc. No. 12-1 at 2, 6; Doc. No. 12-2 at 4.) Defendant argues that despite this policy, "the government declined to prosecute the alleged Indian citizens while simultaneously filing charges against the alleged Central Americans." (Doc. No. 12-1 at 2, 6, 14 ["Had the government been following [the zero-tolerance] memo when it chose to prosecute [Defendant], it would have charged the citizens of India as well."].) Thus, Defendant claims that this failure of the government to follow its own zero-tolerance policy demonstrates that "the President and the Attorney General had made clear their expectation that the migrants from Central America would be prosecuted." (Doc. No. 12-1 at 14.) However, it is apparent based on statistics provided in the Government's opposition, that while the "zero-tolerance" policy had been announced, by April 27, 2018 it had not yet been fully effected. As discussed, between April 27, 2018 and April 29, 2018, Border Patrol's San Diego sector apprehended 232 individuals for illegal entry who were not prosecuted, including thirty-four Central American citizens. (Doc. No. 24 at 9.)

11

supported by a declaration which places that representation in dispute." CrimLR 47.1.g.1. The Court finds Defendant's failure to dispute via declaration any of the factual contentions in Agent Yamasaki's declaration, and specifically the representation that Defendant was a member of the caravan and the three Indian nationals were not members of the caravan, amounts to a concession of its accuracy.[8]

Defendant cites public statements made by President Donald J. Trump and Attorney General Jeff Sessions in regard to the caravan. (Doc. No. 12-1 at 3-6; Doc. No. 12-2 at 2, 4, 6.) The Court finds that these statements attributed to the President and Attorney General are primarily directed at the influx of a caravan of asylum seekers. The prosecution of caravan participants who have entered the United States illegally is distinct from the selective prosecution of individuals from Central America. As stated in Agent Yamasaki's Declaration, "Between April 27, 2018, and the present, every individual apprehended by Border Patrol's San Diego sector who was identified as a caravan participant was submitted to the United States Attorney's Office for prosecution regardless of their citizenship unless there were countervailing humanitarian reasons . . . . Conversely, between April 27 and 29, 2018, San Diego sector Border Patrol apprehended approximately 232 individuals for illegal entry who were not identified as caravan members and who were not prosecuted, including approximately 34 citizens of Honduras, Guatemala, and El Salvador." (Doc. No. 24-2 ¶ 13.) The facts as detailed above bear out that the motive for prosecution of Defendant was not based on his national origin, but rather upon his status as a caravan participant.

---

[8] Defendant in his reply cites Rule 47.1 for the proposition that he be allowed to cross examine Agent Yamasaki during a hearing. (Doc. No. 27 at 7 [quoting CrimLR 47.1.g.4.].) What Defendant fails to cite is the requirement that a declaration putting a factual representation in dispute must be filed *before* the Court need consider granting an evidentiary hearing. CrimLR 47.1.g.1 (emphasis added) ("When an opposing party contests a representation of fact contained in a moving declaration, *opposition must likewise be supported by a declaration which places that representation into dispute . . . . The court need not grant an evidentiary hearing where either party fails to properly support its motion or opposition*."). Defendant did not comply with the rule. Accordingly, the Court **DENIES** his request to cross examine Agent Yamasaki under Rule 47.1.

In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Armstrong,* 517 U.S. at 463. The Court finds that Defendant has not met this burden for either discriminatory effect or motive. The Motion (Doc. No. 12) is **DENIED**.

### C. Discovery Request

The Supreme Court in *Armstrong* acknowledged that "[t]he justifications for a rigorous standard for the elements of a selective prosecution claim . . . require a correspondingly rigorous standard for discovery in the aid of such a claim." 517 U.S. at 468. Accordingly, a defendant is not entitled to discovery unless he provides "some evidence tending to show the existence of the essential elements" of a selective-prosecution claim. *Id.* at 468–69; *Bass*, 536 U.S. at 863 ("In *United States v. Armstrong* . . . we held that a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent."). The Federal Defenders of San Diego's own manual, *Defending a Federal Criminal Case*, stresses the "rigorous standard" applied to obtain discovery in a selective prosecution case:

> The government is not required to provide discovery regarding selective prosecution claims unless and until the defendant establishes a prima facie case. *See Armstrong*, 517 U.S. at 456. Making out a prima facie case requires that a defendant overcome, with "clear evidence to the contrary," the presumption that prosecutors act with good faith and integrity when seeking indictments. *Id.* at 464 (internal citation omitted). Clear evidence to contradict this "presumption of regularity," consists of proof that the prosecutorial decision at issue "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465 (internal citation omitted). The proof must amount to "a credible showing of different treatment of similarly situated person." *Id.* at 470

Federal Defenders of San Diego, *Defending a Federal Criminal Case* § 6.08.04 (2016). This "rigorous standard" is "one designed to minimize interference with the prosecutorial function." *Arenas-Ortiz*, 339 F.3d at 1069. In order to obtain discovery on his selective prosecution claim, Defendant must show "some evidence" that similarly situated persons were not prosecuted. *See Armstrong*, 517 U.S. at 469.

Here, Defendant has not met this rigorous standard. As detailed in Sections III.A. and III.B., Defendant has not made the necessary threshold showing of both discriminatory effect and purpose to support his claim of selective prosecution. Similarly, for the reasons stated above, the Court finds that he has failed to present "some evidence" that amounts to a credible showing of discriminatory effect and purpose. *See Bourgeois*, 964 F.2d at 940-41 ("The government need not provide discovery on a selective prosecution claim simply because law enforcement officials focused for a short time on a racially homogeneous criminal group."); *Armstrong*, 517 U.S. at 459-60 (finding that defendant failed to identify individuals who were not defendant's race and could have been prosecuted for the same offenses).

The request for discovery is **DENIED**.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss the Complaint for Selective Prosecution and his corresponding requests for discovery (Doc. No. 12) are **DENIED**.

Dated: June 15, 2018

Hon. Bernard G. Skomal
United States Magistrate Judge